NABORS OIL & GAS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7962. Promulgated August 22, 1927.

Actual cash value of mineral rights paid in for capital stock in 1911 determined for invested capital purposes.

*E. W. R. Ewing, Esq.*, for the petitioner.
*Granville S. Borden, Esq.*, for the respondent.

This proceeding results from the determination of deficiencies in income and profits taxes for the years 1918 to 1921, inclusive, aggregating $6,922.08. Petitioner avers error was committed in the determination of invested capital with reference to the value of mineral rights paid in for capital stock of the petitioner in 1911, claiming the value when paid in was $183,500 instead of $36,705, the amount allowed by respondent.

FINDINGS OF FACT.

The petitioner is a Louisiana corporation with its principal office at Mansfield, and was incorporated in June, 1911, with an authorized capital stock of $200,000 par value. During the year 1904 the Louisiana Coal & Lumber Co. acquired the mineral rights to 7,215 acres of land located about 7 miles from Mansfield, La., and about 40 miles from Shreveport, La., issuing therefor its capital stock upon a valuation of $50 per acre for the lands. This valuation was based on information and advice received from a mining engineer who investigated the value of the property for the company. Lignite outcropped on the property in ledges of water courses showing strata 6 to 8½ feet thick. There was more than one horizontal stratum and the deposits were estimated to run about 7,100 tons per acre. The entire acreage, however, was not underlaid with

lignite. An entry was made in 1904 in a horizontal stratum of lignite, 7 feet thick, and an entrance about 4½ feet wide was extended horizontally 75 feet. Several carloads of lignite were sold at $5 per ton, which yielded a profit of about $1 per ton. Sales were made in 1904 to the president of a college in Mansfield, La., and one carload was given to the Kansas City Southern R. R. The lignite was of high quality.

In 1909 the Louisiana Coal & Lumber Co. sold to a trustee, who was acting for its stockholders, the Nabors family, and S. G. Semple, all of its mineral rights upon the 7,215 acres of land for a cash consideration sufficient to enable it to discharge all of its liabilities, amounting to about $900, and thereafter it dissolved.

The property had given indications of gas and oil through leakages and seepages for many years, but it was in March, 1911, that the drilling of wells was started so that in April, 1911, a producing gas well was brought in at a depth of 840 feet, by a firm of drillers operating under a lease providing to the lessors a royalty of one-eighth of the oil produced and a payment of $200 for each producing gas well. Immediately after the first producing gas well came in the mineral rights rose sharply in value. Four producing gas wells had been drilled prior to August, 1911, when the petitioner acquired the mineral rights. The gas wells were capped and their flow diverted into the gas supply line leading to Mansfield, La.

Natural gas was preferred over lignite by the consumers wherever available and after discovery of gas under the lands no attempt was made to mine the lignite.

The petitioner was organized in 1911, and issued in that year $183,500 par value of its capital stock, including 47 shares turned over to an attorney for professional services in connection with the organization of the petitioner, 4 shares turned over to M. A. McHenry in recognition of cash he had contributed to the Louisiana Coal & Lumber Co., and capital stock issued to members of the Nabors family for the mineral rights to the 7,215 acres of land which they acquired from the Louisiana Coal & Lumber Co. The mineral rights were set up on the petitioner's books by entries in the cash book in August, 1911, debiting " Mineral Rights Account " $183,500— " Minerals taken in payment of stock subscribed," and crediting " Capital Stock Account " $183,500—" Stock which was subscribed and paid for in mineral rights on lands."

The mineral rights to the 7,215 acres of land had an actual cash value when paid in for capital stock of at least $25 per acre.

Discovery oil wells were brought in early in 1913.

One share of capital stock, par value $100, was issued in 1914 for $75 cash and the mineral rights upon one acre of land.

On November 10, 1919, mineral rights to 240 acres of the land acquired in 1911 for capital stock were sold to the Grand Bayou Planting Co. at a price of $25 per acre in exchange for $6,000 par value of the petitioner's capital stock and the capital stock thus acquired was canceled.

The excess-profits taxes for 1918, 1919, and 1920 were computed, by the respondent, under section 302 of the Revenue Act of 1918.

## OPINION.

MILLIKEN: The issue here presented is solely a question of fact, and relates to the actual cash value for invested capital purposes of certain mineral rights when paid in to petitioner for capital stock in 1911. The mineral rights were set up on the books of petitioner when acquired at a valuation amounting to $183,500, which was the par value of all of the capital stock of petitioner issued in 1911. The respondent in revising the balance sheets of the petitioner prior to December 31, 1919, has shown a value for the mineral rights of $36,705, which he calls "cost" and he sets up, as a separate item, the remainder of the book value as "appreciation." It developed at the hearing of this cause that neither of these valuations is correct, for the respondent erred in the number of acres acquired and the petitioner erred through including in the value of the rights an amount paid for personal services in capital stock. No evidence was adduced of the value of the services and that question is not before us.

Respondent has allowed a value for the mineral rights of $5 per acre, applied to the entire acreage, but he now pleads that such an allowance is excessive, relying upon the failure of the petitioner to define the areas and the reserves comprehended within the total acreage which contained deposits of gas or lignite. Respondent has offered no evidence thereof.

We find in the situation in 1911, as presented by the record, reason to believe that there attached to all of this acreage a considerable value. Lignite outcropped in the water courses in thick strata, and it had been known for some time that there were surface traces of oil. Shortly before acquisition of the mineral rights by petitioner, the first gas well came in, and the value of the rights increased sharply.

We are not concerned with an exact definition of the extent and location of the mineral deposits, for we are satisfied after a careful consideration of the record that the actual cash value of the mineral rights claimed by the petitioner is supported by the evidence adduced. For invested capital purposes we find that the rights had an actual

cash value in 1911 of at least $25 per acre and this value per acre should be applied to 7,215 acres which were acquired in 1911.

> *Judgment will be entered upon 15 days' notice, under Rule 50.*

Considered by MARQUETTE, PHILLIPS, and VAN FOSSAN.